IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALESANDRA LEIMAN, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| NUTRISYSTEM, INC., | : | No. 18-3358 |
| Defendant. | : | |

MEMORANDUM

**Schiller, J.**                                                                                                                                                                            July 3, 2019

Beginning in the fall of 2016, Alesandra Leiman was a sales representative for Nutrisystem, Inc. However, for nearly her entire tenure with the company, she was unable to meet the company's required performance metrics. By the following August, Nutrisystem had fired her. The reason for her firing is the central dispute in this lawsuit. While Leiman contends that she was terminated because she was disabled and requested a reasonable accommodation, Nutrisystem maintains that it fired Leiman due to her inadequate job performance.

Nutrisystem has now moved for summary judgment on Leiman's disability discrimination and retaliation claims under both the Americans with Disabilities Act ("ADA") and the Pennsylvania Human Relations Act ("PHRA"). Because there are no genuine disputes of material fact with respect to any of the four claims, the Court grants Nutrisystem's motion in its entirety.

**I. BACKGROUND**

      **A.**     **Nutrisystem and its Performance Requirements**

Nutrisystem is "a provider of weight management products and services, including nutritionally balanced weight loss programs sold primarily online and over the telephone." (Def.'s Statement of Undisputed Facts [Def.'s SUF] ¶ 5.) In October 2016, Nutrisystem recruited and hired Leiman as an inside sales representative. (*Id.* ¶¶ 10, 16.) After completing two weeks of training,

1

she began working the 3:30 p.m. to midnight shift under the supervision of Sales Supervisor Daniel Hoban. (*Id.* ¶ 17; Pl.'s Resp. to Def.'s SUF Ex. B [Hoban Dep.] at 22.) Like all other sales representatives, Leiman was hired with an initial 90-day probationary period. (Def.'s SUF ¶ 20.)

As a sales representative, Leiman "handl[ed] both inbound and outbound calls to sell [Nutrisystem] products." (*Id.* ¶ 6.) Additionally, she was responsible for "build[ing] rapport with customers," consulting dietary specialists about prospective customers' eligibility for certain programs, and "meet[ing] or exceed[ing] all monthly defined targets or quotas." (*Id.* Ex. J.) These objective metrics included "sales conversion, revenue, up sell conversion, lead acquisition, [and] outbound sales." (*Id.* ¶ 39.)

Twice per month, sales representatives, including Leiman, were evaluated on all these metrics and their scores were tracked in Department Performance Plans ("DPPs"). (*Id.* ¶¶ 40-41; Hoban Dep. at 35.) For each metric, Sales Director Vidya Mohammed would set a monthly goal. (Def.'s SUF ¶ 41; Hoban Dep. at 42.) Sales representatives were rated on a scale of "1" to "5" on each metric, based on their performance relative to the established goal. (Hoban Dep. at 37-38.) The individual metric ratings were then used to create a composite monthly score for each representative. (*Id.*) For each individual metric and composite score, the monthly benchmark goal was "3." (*Id.*)

The parties agree that, after a sales representative's initial 90-day probationary period, "it was customary" to put any sales representative unable to meet the 3.0 benchmark for three consecutive months on a performance improvement plan ("PIP"), pursuant to Nutrisystem's performance disciplinary policy. (Def.'s SUF ¶ 49.) However, at his deposition, Hoban testified that there was some discretion in the policy: exceptions to the policy were "based on tenure,"

meaning that a newer employee might receive extra time to "get up to speed" before placement on a PIP. (Hoban Dep. at 102.)

Pursuant to Nutrisystem's policies, a sales representative had two months to improve her performance and achieve the 3.0 benchmark after placement on a PIP. (Def.'s SUF ¶ 50.) If a sales representative failed to do so, that representative would be fired. (*Id.* ¶ 50; Ex. F [Cameron Dep.] at 83-84.)

B.     **Leiman's Disability and Request for Accommodation**

On May 31, 2017, approximately seven months after starting at Nutrisystem, Leiman submitted a request for accommodation to Human Resources Generalist Rose Harrell. (*Id.* ¶¶ 24-25; Pl.'s Resp. to Def.'s SUF Ex. A [Leiman Dep.] at 80.) Specifically, Leiman submitted a letter from her psychiatrist, which stated that Leiman was "unable" to "work the third shift" from 3:30 p.m. to midnight due to her diagnoses of Attention Deficit Disorder and Adjustment Disorder with Depression and Anxiety and requested that she have a schedule change to accommodate her disability. (Def.'s SUF ¶ 25; Leiman Dep. at 82.) Upon Harrell's request, Leiman submitted Nutrisystem's reasonable accommodation forms filled out by her psychiatrist on June 6, 2017. (Def.'s SUF ¶¶ 26-27.)

The record does not establish exactly when Mohammed and Sales Manager Sheryl Reynolds became aware of Leiman's request for an accommodation. In its Statement of Undisputed Facts, Nutrisystem states that Leiman met with Harrell and Mohmmed to discuss the accommodation after Leiman submitted her official reasonable accommodation paperwork on June 6. (*Id.* ¶ 28.) However, the cited portion of Leiman's deposition indicates only that Leiman met with Harrell. (Leiman Dep. at 86.) During that meeting, Harrell referenced conversations she had already had with Mohammed and Reynolds regarding the request. (*Id.*) According to Leiman's

testimony, Harrell stated that Mohammed and Reynolds had asked if Leiman's shift change would be permanent, to which Harrell responded that "it was and that [Nutrisystem was] going to follow the letter of the law." (*Id.*)

By June 8, 2017, Nutrisystem granted Leiman's request for a permanent shift change and advised Leiman of this change by email. (Def.'s SUF ¶ 29.) Mohammed, Reynolds, and Sales Supervisors Daniel Hoban and Ted Cameron were all copied on this correspondence. (*Id.* Ex. O.) Although the email did not include details about Leiman's disabilities, it did state that the shift change was being made as "an ADA job modification." (*Id.*) On June 12, 2017, Leiman began working the 10:30 a.m. to 7:00 p.m. shift with Cameron as her new supervisor. (*Id.* ¶¶ 30, 33.)

### C. Leiman's PIP and Termination

Approximately one week after Leiman submitted her initial request for an accommodation, and on the same day that she submitted Nutrisystem's official forms for such a request, Nutrisystem placed Leiman on a PIP for failure to maintain a 3.0 benchmark average for three consecutive months after the initial probationary period. (*Id.* ¶¶ 46, 49, 52-53; Ex. X.) Hoban, Leiman's direct supervisor, testified that he drafted Leiman's PIP and that he was unaware of her disability or request when he did so. (Hoban Dep. at 93, 104-05.) However, Hoban indicated that Reynolds and Mohammed were also involved in the decision to place Leiman on the PIP. (*Id.* at 101-02.) As previously stated, it is not clear when Reynolds and Mohammed learned about Leiman's disability and request for accommodation, and, thus, the record does not establish whether they knew this information when deciding to place Leiman on a PIP.

The parties agree that Leiman's overall benchmark was less than 3.0 for the months of January through May, before she was placed on a PIP. (Def.'s SUF ¶¶ 46-47.) However, Leiman testified that she never was advised about the PIP, received a copy of the PIP, or was told about

4

any performance problems except with regard to outbound calls. (Pl.'s Resp. to Def.'s SUF ¶¶ 52-61.)

There is inconsistent testimony in the record about the dates of Leiman's probationary period, three months after which she could be placed on a PIP. Nutrisystem states, without citing to the record, that Leiman was still within the probationary period during January and February 2017. (Def.'s SUF ¶ 46.) However, Hoban's testimony contradicts Nutrisystem's timeline: he testified that, by the start of February, Leiman was no longer on probation. (Hoban Dep. at 68-69.) This comports with the basic timeline of Leiman's employment: her first day was October 31, 2016, suggesting that her 90-day probationary period would end before February 2017.

Leiman testified that, after she notified Nutrisystem of her disability and received a reasonable accommodation, Reynolds treated her differently than she had previously and than she treated Leiman's peers. Specifically, she testified that Reynolds listened in on Leiman's phone calls, which Leiman had never seen Reynolds do to other sales representatives; Leiman testified that it was always a sales trainer who listened in on calls. (Leiman Dep. at 150-51.) Leiman also testified that Reynolds would frequently remind Leiman that she could not stay past 7:00 p.m., which Leiman felt unnecessarily drew attention to her accommodation in front of her peers. (*Id.* at 152-54.) Leiman indicated that she felt excluded from her new team after Nutrisystem granted the accommodation and she changed shifts. (*Id.* at 149-151.) Furthermore, she testified that, after her accommodation, she began to receive customer service calls primarily, rather than sales calls like her teammates. (*Id.* at 156.)

In the months following Leiman's disclosure of her disability and request for an accommodation—the months of her PIP—Cameron sent Leiman emails regarding her

performance metrics and tips for improving in areas where she failed to meet the requisite goals. (Def.'s SUF Exs. Z, BB.)

Nonetheless, Leiman was unable to meet the 3.0 benchmark in the two months following her placement on a PIP. Leiman does not contest that she received a 2.31 in June and a 2.63 in July. (*Id.* ¶¶ 63, 66.) She was fired on August 2, 2017. (*Id.* ¶ 69.) According to Nutrisystem, Mohammed and Reynolds decided to fire her because she could not meet the objective metrics. (Cameron Dep. at 83-84.) Cameron, who was Leiman's supervisor during her PIP, stated that there was no flexibility regarding this decision. (*Id.*) The PIP document itself indicates that termination is one outcome of failure to meet the performance metrics after two months: "[f]ailure to achieve a minimum combined average final score of 3.0 on her DPP at the end of the next 2 months . . . may lead to further progressive disciplinary action leading up to and including termination." (Def.'s SUF Ex. X at 2.) Consistent with this policy, Nutrisystem has provided evidence that other sales representatives who failed to reach the benchmark goal of 3.0 within two months of the issuance of a PIP but who had not requested reasonable accommodations for disabilities were terminated. (*Id.* Exs. HH, JJ.) Leiman has failed to produce evidence of other sales representatives without disabilities who were treated differently than she was after failing to the meet the objective performance metrics.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-

moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248.

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

### III. DISCUSSION

Leiman sued Nutrisystem for disability discrimination and retaliation under both the ADA and PHRA, and Nutrisystem moved for summary judgment on all counts. Because there are no genuine disputes of material facts, the Court grants Nutrisystem's motion.

#### A. ADA Framework

Disability discrimination claims under the ADA are subject to the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667-68 (3d Cir. 1999). This framework also applies to retaliation claims under the ADA when there is no direct evidence that the adverse employment action was based on protected activity. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). The *McDonnell Douglas* analysis includes three steps. First, the plaintiff must establish a prima facie

case. *McDonnell Douglas*, 411 U.S. at 802. Once this is established, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* At the third step, the plaintiff must have "a fair opportunity to show that [the defendant's] stated reason for [the plaintiff's] rejection was in fact pretext." *Id.* at 804. Although the burden of production shifts at each stage of the analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

Because the ADA and PHRA are "effectively indistinguishable" from one another and courts may, therefore, "dispose of both ADA and PHRA claims on the same grounds," the Court will not engage in a separate analysis for the claims under each statute. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 142 n.5 (3d Cir. 2011). The Court's conclusions as to Leiman's ADA claims will apply equally to her PHRA claims. *See Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002).

### B. Disability Discrimination

#### 1. Prima Facie Case

To establish a prima facie case of disability discrimination under the ADA, the plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville Sch. Distr.*, 184 F.3d 296, 306 (3d Cir. 1999). To establish the third element, the plaintiff must demonstrate that "consideration of a protected characteristic was a 'determinative factor' in the plaintiff's adverse employment action." *Fiorentini v. William Penn Sch. Distr.*, 665 F. App'x 229, 237 (3d Cir. 2016). The burden of establishing a prima facie

8

case under the *McDonnell Douglas* framework is not intended to be onerous. *See, e.g.*, *Decker v. Alliant Techs. LLC*, 871 F. Supp. 2d 413, 428 (E.D. Pa. 2012). Rather, the prima facie framework "raises an inference of discrimination" based on the presumption that the adverse employment actions, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254.

There is no dispute that Leiman has satisfied the first two elements of her prima facie case. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. [Def.'s Br.] at 6.) However, Nutrisystem argues that Leiman "has presented no evidence raising a genuine issue of material fact that her discharge was the result of any alleged disability." (*Id.* at 8.)

Because the Court finds that Leiman fails to meet her burden at the third step of the *McDonnell Douglas* framework, it will assume, without deciding, that Leiman has satisfied her prima facie case and proceed with its analysis of the subsequent two steps. *See, e.g.*, *McNneil v. Trustees of Univ. of Pa.*, Civ. A. No. 18-1750, 2019 WL 2024923, at *8 (E.D. Pa. May 8, 2019).

### 2. Legitimate Nondiscriminatory Reason

Once a plaintiff has established her prima facie case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employer's rejection." *McDonnell Douglas*, 411 U.S. at 802. "The employer need not prove that the tendered reason *actually* motivated its behavior." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer's burden is "relatively light" at this stage and "is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

The parties do not dispute that Nutrisystem has provided a legitimate nondiscriminatory reason for its termination of Leiman: unsatisfactory performance. (Def.'s Br. at 10; Pl.'s Mem. of Law in Opp'n to Summ. J. [Pl.'s Br.] at 5.) Thus, Nutrisystem has met its burden.

### 3. Pretext

Once the employer satisfies the second step, the plaintiff again has the burden to "show by a preponderance of the evidence, that the employer's explanation is pretextual." *Fuentes*, 32 F.3d at 763. To succeed at this stage, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764. In order to cast enough doubt onto the employer's proffered reasons, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* at 765. It is not enough simply to "show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.*

"[T]o avoid summary judgment, the plaintiff's evidence . . . must allow a factfinder reasonably to infer that *each* of the employer's proffered nondiscriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is pretext)." *Id.* at 764. However, the plaintiff "need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment . . . because the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an

invidious reason." *Burton*, 707 F.3d at 427. Thus, direct evidence of discriminatory intent is not necessary for the plaintiff to prevail at the summary judgment stage. *Id.*

Nutrisystem argues that Leiman has failed to demonstrate any inconsistencies or contradictions within its stated reason for her termination sufficient to survive summary judgment. (Def.'s Br. at 11.) According to Nutrisystem, Leiman's direct supervisor, Hoban, was simply following Nutrisystem's objective performance policy by placing Leiman on a PIP and ultimately terminating her after she concededly failed to meet the requisite metrics. (*Id.* at 11-12.)

In response, Leiman points to several pieces of evidence that she contends establish pretext. She asserts that her performance was consistent from month-to-month, but Nutrisystem placed her on a PIP and ultimately fired her only after she disclosed her disability. (Pl.'s Br. at 5.) Leiman also contends that she was never notified of the PIP; rather, she was notified only of her shortcomings with respect to one of the many metrics—outbound calls. (*Id.*) Leiman states that this particular metric was eliminated the month after she was terminated. (*Id.* at 6.) Furthermore, Leiman testified that she was treated by Reynolds differently after she disclosed her disability—and differently than other sales representatives. Leiman argues that, taken together, she has met her burden to survive summary judgment.

The Court disagrees with Leiman. For seven months before Leiman was fired—nearly her entire tenure with Nutrisystem—she failed to meet objective performance metrics. She does not dispute this point. After she failed to meet the requirements of her PIP, Nutrisystem fired her, in accordance with Hoban and Cameron's description of Nutrisystem's performance disciplinary policy. While Leiman's performance may have been consistent before her PIP and termination, it was consistently substandard. Nutrisystem's performance disciplinary policy explains why Nutrisystem treated Leiman's repeatedly low scores differently in the summer of 2017 than it did

11

in the months before: Nutrisystem relied on a several-month average for determining whether to place someone on a PIP and this occurred only at the completion of a new employee's three-month probationary period.

Although there is some factual uncertainty about exactly when Leiman became eligible to go onto a PIP, whether anyone involved in the decision to place her on one was aware of her disability, and how much discretion they had in making the PIP placement decision, none of these issues are material. There is no dispute that Leiman scored below 3.0 for the three months preceding her placement on a PIP and that Nutrisystem's policy permitted placement on a PIP when this occurred.

Leiman also testified that she was never told about the PIP, even though a PIP document is included in the record. Even assuming Leiman received no notice, the Court finds that Leiman has failed to demonstrate pretext. The implication of Leiman's argument is that Nutrisystem developed a paper trail to justify their discriminatory firing, creating a PIP but never actually delivering it to her in the hopes that she would not improve. But other evidence in the record belies this argument. Nutrisystem has produced emails sent by Cameron to Leiman throughout the PIP period offering advice for improvement. While Leiman did testify that she was singled out by Reynolds, she does not argue that this impacted her objective evaluations, on which Nutrisystem's decision to fire her rested. Moreover, Leiman has not actually produced evidence of Nutrisystem's performance policy showing that a PIP is valid only if it is disclosed to the relevant employee.

Finally, Leiman contends that the only metric she was struggling to meet—outbound calls—was eliminated right after she departed. Even if Nutrisystem eliminated this metric, which it denies, Leiman concedes that her performance was, on average, substandard on the metrics in use while she was employed. Those metrics included but were not limited to outbound calls.

Ultimately, Leiman has failed to show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Nutrisystem's stated reason for firing her. *See Fuentes*, 32 F.3d at 765. Leiman's many arguments do not amount to evidence from which a reasonable factfinder could disbelieve Nutrisystem's articulated reason for her termination and instead find that it was pretext for discrimination in violation of the ADA. Accordingly, the Court grants Nutrisystem's motion as to the ADA and PHRA disability discrimination claims.

### C. Retaliation

#### 1. Prima Facie Case

A plaintiff must show the following in order to establish a prima facie case of retaliation under the ADA: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002).

To establish the second prong of a prima facie case of retaliation, a plaintiff must show that a reasonable employee would find the employer's action "materially adverse," meaning that the employer's action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 195 (3d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Such retaliatory conduct must be "serious and tangible enough to alter the employee's compensation, terms, conditions, or privileges of employment." *Caver v. City of Trenton*, 420 F.3d 243, 255 (3d Cir. 2005). Several district courts in the Third Circuit have held that placement on a performance improvement plan does not meet this standard. *See, e.g.*, *McKnight v. Aimbridge Emp. Serv. Corp.*, Civ. A. No. 15-

3461, 2016 WL 8716275, at *7 (E.D. Pa. Sept. 16, 2016); *Cashman v. CNA Fin. Corp.*, Civ. A. No. 08-5102, 2012 WL 113667, at *10 (E.D. Pa. Jan. 13, 2012).

To satisfy the third prong of the prima facie case for retaliation, a plaintiff must demonstrate a "causal link" between the adverse action and the protected activity. *LeBoon v. Lancaster Jewish Cmty. Cty. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Courts look to "a broad array of evidence" to determine whether this causation element is met. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). "Where the temporal proximity between the protected activity and the adverse action is unusually suggestive, it is sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon*, 503 F.3d at 232; *see also Mercer v. SEPTA*, 608 F. App'x 60, 65-66 (3d Cir. 2015) (stating that, to be unusually suggestive, "[t]he adverse action must occur within days, not months, of the protected activity"). If the timing is not unusually suggestive, courts must determine whether the record evidence, "looked at as a whole, may suffice to raise the inference." *Farrell*, 206 F.3d at 280. A plaintiff may offer evidence including "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon*, 503 F.3d at 232-33.

Here, Nutrisystem concedes that Leiman has established the first prong of her prima face case but disagrees about which actions were "adverse" for purposes of the second prong. (Def.'s Br. at 12-13.) While Nutrisystem admits that termination is adverse, it argues that placement on a PIP is not. (*Id.* at 13.) The Court agrees with Nutrisystem. Leiman has failed to show that her placement on a PIP "alter[ed her] . . . terms, conditions, or privileges of employment" such that a reasonable employee would be dissuaded from reporting discrimination. *See Caver*, 420 F.3d at

255. Thus, the Court will treat Leiman's termination as the only adverse action for purposes of analyzing her retaliation claims.

Nutrisystem also argues that Leiman has failed to demonstrate the third element of a prima facie case of retaliation. (Def.'s Br. at 12-13.) Nutrisystem contends that the two-month period between her request for an accommodation and her termination is not "unusually suggestive" and that there is no other evidence sufficient to raise an inference of retaliation. (*Id.* at 14-15.) In response, Leiman argues that the two-month period between her request and termination and other evidence of antagonism towards her demonstrate a causal connection between her protected activity and termination. (Pl.'s Br. at 10-11.)

Because the Court again finds that Leiman has failed to meet her final burden for her retaliation claims, it will assume, without deciding, that she has proffered sufficient evidence from which a reasonable factfinder could determine that she has raised an inference of retaliation and thus satisfied her prima facie case.

### 2. Legitimate Nondiscriminatory Reason

As with the disability discrimination claim, Nutrisystem has proffered a legitimate, nondiscriminatory reason for its termination of Leiman: her poor performance. (Def.'s Br. at 15.) This satisfies Nutrisystem's burden at step two of the *McDonnell Douglas* test.

### 3. Pretext

For the same reasons discussed above, the factual disputes identified by Leiman are not material to her retaliation claims. Leiman has failed to proffer sufficient evidence from which a reasonable jury could conclude she was terminated because of her activity protected under the ADA. The Court grants Nutrisystem's motion for summary judgment on Leiman's ADA and PHRA retaliation claims.

**IV.     CONCLUSION**

For the reasons discussed above, Nutrisystem's motion for summary judgment is granted.

An Order consistent with this Memorandum will be docketed separately.